IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOSEPH D. BOLEK, IV,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ANDREW M. SAUL, Commissioner of Social Security Administration,<br><br>                    Defendant. | **8:19CV328**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court on motions for judicial review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner"). Filing Nos. 11 and 13. The plaintiff, Joseph D. Bolek, IV, appeals the Commissioner's decision to deny his application for Social Security Disability benefits under the Social Security Act and seeks review pursuant to 42 U.S.C. § 405(g).

I.      **BACKGROUND**

A.      **Procedural History**

Bolek filed an application for disability benefits on May 24, 2015, alleging that he suffered from a disability beginning on January 20, 2015. Plaintiff must establish disability on or before the date he was last insured, September 30, 2019, in order to be entitled to benefits. 42 U.S.C. § 416(i) 423(d). The Commissioner denied his application initially and upon reconsideration. Following a September 13, 2017 hearing, an administrative law judge ("ALJ") denied benefits on December 26, 2017. Filing No. 9-2, Tr. at 7. On May 28, 2019, the Appeals Counsel denied review, and the ALJ's decision stands as the final decision of the Commissioner. *Id.* at 1.

1

Bolek challenges the ALJ's finding, arguing that the ALJ was improperly appointed under the Appointments clause of the Constitution. Bolek also argues that the ALJ erred when he determined that Bolek did not meet Listing 1.02A or meet the medical equivalent of that listing. Further, he argues that the ALJ erred when he did not grant the treating physician Dr. Jeremy Gallant controlling weight and erred when he found that Bolek's testimony regarding his limitations was not credible. Filing No. 12, Tr. at 17, 20, 26, 28.

### B.    Hearing Testimony

Plaintiff is now forty-five years old and was thirty-nine years old at the time of his alleged onset date. He has previous relevant work experience as a retail department supervisor, operating manager, personal banker, and cable installer. He completed high school and one year of college. Filing No. 9-2, Tr. at 69-70. At the hearing held on September 13, 2017, Bolek testified that he lives in Omaha, Nebraska with his wife and their four children. *Id.* at 38-39.

On January 20, 2015, Bolek was injured while working as Manager of Fanzz, Inc. when loading a cardboard compactor. A wheeled dolly used to transport the cardboard rolled down an incline and hit Bolek's leg, just below the knee cap. He testified, "I lost all feeling and went down under the dolly and it shoved my kneecap up." *Id.* at 49-50. The claimant sought treatment the day of the injury and has since been treated with medications, physical therapy, injections, and nerve blocks. *Id.* at 51. As of the date of the hearing, surgical intervention was not recommended for Bolek's injury. *Id.* Bolek testified that the only treatment available was to manage his pain. *Id.*

Bolek has not been able to walk on his own since the accident. *Id.* at 40. He has relied on crutches to ambulate but now requires a wheelchair. *Id.* Without assistive devices, Bolek cannot walk or stand whatsoever. However, with crutches he can walk for

approximately ten minutes before needing to rest.  *Id.* at 53.  Bolek is either in his wheelchair or his recliner for the majority of the day.  While in his wheelchair, his left leg is elevated.  *Id.* at 54.  He must lower his leg every forty-five to sixty minutes in order to promote circulation.  *Id.*  He can only sit without his leg elevated for approximately ten minutes before the pain becomes too great.  *Id.*

Bolek testified that he has been diagnosed with stress, anxiety, and depression. *Id.* at 56.  While he does not see a counselor for his mental illnesses, his treating physician has prescribed anti-depressants.  *Id.*  He also testified that he has problems with memory due to sleep deprivation.  *Id.* at 56, 57.  Bolek sleeps for "a couple" of hours per night due to the pain in his left leg.  When asked how long he can remember things, Bolek testified that he can only remember things such as the plot of a television show he just watched, the chapter of a book he just read, or a conversation with his children he just had for about ten minutes before forgetting what happened.  *Id.* at 57.

Bolek can groom himself and take care of his own personal needs.  A handicap seat in the shower allows him to clean himself without help.  *Id.* at 58.  However, he is unable to do household chores such as cooking, cleaning, and laundry due to his pain and inability to stand and walk for long periods of time.  *Id.* at 58-59.  He testified that he has fallen several times since the accident in January 2015.  He stated that he has fallen while climbing the stairs several times and has fallen many times while in the bathtub.  *Id.* at 59.  He stated, "[My leg] doesn't want to do much anymore.  So I got to stay on it as little as possible because it starts shaking because it just doesn't have the energy anymore . . . . [t]he other day I was just coming in through the door, I ended up falling against the door because my leg gave out."  *Id.* at 60.  Bolek stated that his pain level

was always at an 8 or 9.  The ALJ in response mentioned, "I've read that in your file, and I can tell you're grimacing while you're here."  *Id.* at 62.

After Bolek's testimony, his wife Julie Bolek testified.  She stated that her husband "is an extreme amount of pain all the time."  *Id.* at 62.  Before his injury, Julie Bolek said that Bolek ran, jumped, climbed trees with the children, and helped cook and clean.  *Id.* at 62-63.  He also worked 60 to 70 hours per week prior to working at Fanzz, Inc.  She testified that his mood has changed substantially since his injury.  He is much angrier and cannot do things he once enjoyed, such as cooking for the family.  *Id.* at 63-64.

The ALJ then asked both Julie Bolek and the claimant how he would be able to manage a stationary job.  *Id.* at 65.  Julie Bolek stated, "I'm not sure.  Because even while he's sitting, he's in pain.  So he'll have to go from sitting to laying down, to sitting . . . . He has to try multiple ways just to find comfort, and there is no comfort."  *Id.* at 65-66.  Bolek testified, "If I can't sit, because it's just still too painful, I'll go lay down and try to at least – I can't sleep, but I try to relax as much as possible."  *Id.* at 66.

The ALJ asked, "if you had an eight-hour day that you could picture, how much of that day do you think you could be in an upright seated position?  I know he said, like, 10 or 15 minutes at one time, but . . . could you sit for two hours, four hours?"  *Id.*  Bolek said he could sit with his leg elevated for maybe four hours before the pain became too intolerable.

Lastly, the vocational expert, Mr. Lenhart, testified.  He was asked if someone with a high school education and one year of college education who was restricted to sedentary employment opportunities could perform Bolek's past job experience as a retail department supervisor, operating manager, personal banker, or cable installer.  *Id.* at 69-70.  Mr. Lenhart responded that the only job available to the hypothetical person would

4

be personal banker.  *Id.* at 70.  The ALJ then asked Mr. Lenhart if there were any other jobs in the national economy in which the hypothetical person could be employed.  Mr. Lenhart stated that the hypothetical person could work as a telephone quotation clerk, charge account clerk, and an order clerk.  *Id.*  The ALJ proceeded to ask a second hypothetical.  He asked if the answer to the previous hypothetical would change if the person's leg needed to be elevated to knee level during any seated activity.  Mr. Lenhart testified that his answer would not change.  *Id.* at 70-71.  The ALJ asked if the answer would change if the hypothetical person was required to use crutches or a wheelchair for any period of standing, walking, or ambulation.  Mr. Lenhart responded that his answer would not change.  *Id.* at 71.  Finally, the ALJ asked if someone "could not perform more than four hours of sitting, total, in an eight hour work day – so they could not meet the sedentary definition of six hours – would there be any jobs available, either from his past work or in the national economy?"  *Id.* at 71-72.  Mr. Lenhart testified, "There would be nothing available."  *Id.* at 72.  The ALJ did not ask the vocational expert any questions regarding Bolek's mental impairments.

### C.   Medical Evidence

Medical records show that Bolek has been diagnosed with complex regional pain syndrome type II ("CRPS"), peroneal neuropathy, and depression.  Filing No. 9-7, Tr. at 347, 348, 373, 378, 379.  Bolek was diagnosed with CRPS and peroneal neuropathy in the months following his knee injury.  He was diagnosed with depression resulting from his injury due to the pain and his alleged inability to work.  *Id.* at 378.  While his depression first began without suicidal ideations, it developed to involving passive suicidal ideations around January 2017.  *Id.* at 378; Filing No. 9-9, Tr. at 482.

5

Bolek has seen his treating physician, Jeremy Gallant, M.D., since April 2015. Filing No. 9-7, Tr. at 378. Prior to seeing Dr. Gallant, Bolek was treated by Mark A. Pitner, M.D. for his knee injury. *Id.* at 306, 312. During an appointment with Dr. Pitner in February 2015, Bolek complained of pain in his left knee that began immediately after the dolly struck him on January 20, 2015. *Id.* at 312. Dr. Pitner's notes indicate there was bruising over the anterior left knee and no fluid in the prepatellar bursa. *Id.* at 313. There was "marked tenderness to palpation over the anterior patella particularly in the inferior portion as well as over the intraarticular effusion." *Id.* There was no tenderness at the pes anserine bursa. *Id.* However, Bolek had a difficult time keeping his leg straight and could "hold the knee straight actively but [had] pain with this." *Id.* Dr. Pitner's treatment notes state, "I explained to him that he has a quite bit more pain than what I can find on exam and that this is sometimes the case with anterior knee trauma." *Id.* Dr. Pitner ordered an MRI and told Bolek that patients with his symptoms are usually able to get better and resume working again. *Id.* However, Dr. Pitner believed it was reasonable for Bolek to have been off work since the injury. *Id.*

Bolek first began seeing Dr. Gallant in April of 2015. *Id.* at 378. During a visit with Dr. Gallant on April 14, 2015, Bolek described aching and throbbing pain in his left knee that traveled "down the lateral aspect of his leg into his digits, mostly the first through third." *Id.* Dr. Gallant noted that CRPS may be the cause of Bolek's pain. *See id.* (stating, "There has been discussion of CRPS."). During his exam, Dr. Gallant found there was no joint swelling, normal bulk and tone, and range of motion was intact for all extremities. *Id.* at 379. He also noted, "Mild pain with full extension and flexion. Tenderness light touch in the lateral compartment just distal to the knee, weakness with TA and minimal firing of the EHL. Notable weakness in the evertors, otherwise intact strength." *Id.* After

6

reviewing the results of an MRI taken of Bolek's knee, Dr. Gallant found, "There is some edema anterior in the patellar tendon and patella as well as tibial tuberosity. There is also some edema in the office fat pad." *Id.* Dr. Gallant stated that he was "concerned for a peroneal neuropathy" as Bolek had significant knee pain since his injury, significant weakness in his tibialis anterior, and sensory deficits in the peroneal distribution. *Id.* It would later be confirmed that Bolek has a peroneal neuropathy at or about the fibular head with evidence of demyelination but no acute denervation. *Id.* at 373.

Dr. Gallant prescribed medication for his depression and nerve pain. *Id.* at 379. It was recommended to Bolek to go to water therapy to improve his gait pattern, but this did not prove to be helpful for his pain. *Compare id.* at 380 (recommending water therapy to improve gait pattern) *with* Filing No. 9-10, Tr. at 551. Two lumbar nerve block procedures were performed with no significant improvement. *See* Filing No. 9-8, Tr. at 443 (noting, "He did not notice benefit with the sympathetic block."); *compare* Filing No. 9-9, Tr. at 474 (performing the second CT nerve block on March 18, 2016) *with* Filing No. 9-9, Tr. at 468 (noting on April 5, 2017 that all reasonable medical management has failed to help him improve). While Bolek failed to improve, Dr. Gallant still indicated that Bolek could perform sedentary work. Filing No. 9-9, Tr. at 483.

From April 2015 to April 2017, Bolek visited Dr. Gallant approximately fourteen times to address his knee pain as it failed to improve. Filing No. 9-7, Tr. at 347, 356, 370, 378; Filing No. 9-8, Tr. at 394, 397, 400, 417, 424, 455; Filing No. 9-9, Tr. at 467, 471, 476, 482. Bolek was prescribed numerous medications to help ease his pain.[1] As of April

---

[1] From February 2015 to April 2017, Mr. Bolek was prescribed the following at least once: cymbalta, elavil, gabapentin, lidoderm patches, mobic, amitriptyline, norco, topical capsaicin, prednisone, topical lidocaine, loratadine, neurontin, tramadol, lyrica, fosamax, topical ketamine, senna, high-dose vitamin C, carbamazepine, nortriptyline, horizant, and bisphosphonate.

2017, Bolek was ordered to take 120 mg of Cymbalta for his depression, 200 mg of amitriptyline, tramadol, and topical ketamine.[2]  However, throughout the two years of various rounds of medications, two lumbar nerve block procedures, and physical therapy, Bolek's knee pain failed to improve.  *See* Filing No. 9-8, Tr. at 418 (stating, "He has been through nearly all reasonable treatment, failing to improve."); *see also* Filing No. 9-9, Tr. at 468, 472, 477 (noting, "He has been through nearly all reasonable medical management, failing to improve significantly.").

During an April 5, 2017 appointment, Dr. Gallant noted that Bolek was approved for a wheelchair evaluation.  Filing No. 9-9, Tr. at 468.  While being fitted for the wheelchair, it was noted by Ashley A. Sewall, OTD, that Bolek "demonstrated a need for a manual wheelchair to complete mobility related activities of daily living."  *Id.* at 489. Bolek purchased the wheelchair that was fitted for him on April 17, 2017.  *Id.* at 504.  On May 23, 2017, Dr. Gallant indicated that Bolek was now unable to work even sedentary jobs.  *Id.* at 533.

### D.    ALJ Decision

In evaluating Bolek's claim, the ALJ followed the sequential evaluation process. Filing No. 9-2, Tr. at 11-19.   The ALJ determined Bolek met the insured status requirements of the Social Security Act through September 30, 2019.  *Id.* at 13.  He also determined that Bolek had not engaged in substantial gainful activity since the alleged onset date of January 20, 2015.  *Id.*  The ALJ found that Bolek suffered from the severe impairments of obesity, peroneal neuropathy, complex regional pain syndrome, and status post work-related knee injury.  *Id.*

---

[2] Dr. Gallant noted at this visit that Mr. Bolek was not taking any of his medications consistently as "Worker's Compensation has not provided for medications consistently."  Filing No. 9-9, Tr. at 468.

The record did support a finding that Bolek has mild limitations in understanding, remembering, and applying information.  However, the ALJ did not find that these were severe mental impairments.  *Id.*  While Bolek did allege to have swelling in his hands and left elbow, "the record does not document a diagnosis by an acceptable medical source to that effect."  *Id.*  Instead, the ALJ found the swelling to be a part of the diagnosis of CRPS.

He determined that Bolek did not have a severe impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1.  The ALJ considered listing 1.02 (major dysfunction of a joint) and 11.14 (peripheral neuropathy).  He determined that Bolek did not meet the requirements for major dysfunction of a joint because the "evidence fails to establish gross anatomical deformity and an inability to ambulate effectively or to perform fine and gross movements effectively" and because Bolek had functionally intact range of motion in all of his extremities.  *Id.* at 14.  The ALJ found that Bolek did not meet the requirements for peripheral neuropathy as the record did not show disorganization of motor function in two extremities or marked limitations in physical functioning, understanding, remembering, interacting with others, concentration, persisting, or maintaining peace.  He also determined Bolek had functionally intact range of motion in all extremities and did not routinely present himself to the emergency room or hospital.  *Id.*

The ALJ gave "partial weight" to the state agency consultants who determined Bolek could engage in sedentary work with exertional, postural, and environmental limitations.  *Id.* at 16.  The ALJ also gave "partial weight" to Bolek's treating physician, Jeremy Gallant, M.D.  He did not state why Dr. Gallant's opinion was given only partial weight.  The ALJ, however, gave "great weight" to Dr. Gallant's opinion that Mr. Bolek is

9

limited to sedentary work but gave "limited weight" to Dr. Gallant's opinion that Mr. Bolek has a 6 percent whole person impairment rating and that no work is possible. *Id.* at 17. He also gave "limited weight" to Dr. Gallant's opinion that the claimant could reach frequently as Mr. Bolek "had functionally intact range of motion in all extremities, thereby rendering that portion of Dr. Gallant's opinion inconsistent." *Id.*

The ALJ gave "partial weight" to Matthew Stottle, M.D. Dr. Stottle noted that Bolek would be an "excellent candidate" for a DRG stimulation. However, the ALJ found this opinion did "not provide a specific assessment to the claimant's function-by-function abilities, thereby garnering reduced reliance." *Id.* The ALJ gave "limited weight" to Nebraska Certified Vocational Rehabilitation Counselor Paulette K. Freeman's opinion that Bolek had a whole percent impairment rating of 26 percent as she is not an acceptable medical source, and the ALJ stated that this is a determination to be made by the Commissioner of Social Security. *Id.*

The ALJ also gave "partial weight" to "an unidentified clinician" but gave "great weight" to the clinician's determination that Bolek could perform sedentary work. *Id.* The records reflect this unidentified clinician is Dr. Gallant, Bolek's treating physician. The ALJ only gave partial weight as he was thought to be an unidentified physician and he limited Bolek to never standing or walking, which the ALJ determined was "inconsistent with medical evidence showing that the claimant had functionally intact range of motion in all extremities as well as his testimony that he can perform some ambulation at least with assistive devices." *Id.*

The ALJ gave "partial weight" to Julie Bolek's testimony. It was determined that, while she did observe her husband on a regular and consistent basis, she did not have

sufficient knowledge of Social Security Administration procedures to assess his function-by-function abilities.  Her testimony was given equal weight to Bolek's testimony.  *Id.*

The ALJ determined Bolek had residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a).  However, the ALJ stated that Bolek "should use a wheelchair and/or bilateral crutches for any period of standing, walking, or ambulation."  *Id.* at 14.  He also determined that Bolek "should perform no pushing, pulling, or operation of foot controls with the left lower extremity."  *Id.* While he determined Bolek could occasionally stoop or balance, he could not climb, crawl, crouch, kneel, or tolerate exposure to extreme temperatures, vibrations, or workplace hazards.  He could not engage in commercial driving and his lower left extremity should be elevated to at least knee level while sitting.  *Id.*

The ALJ noted that Bolek described symptoms of increased pain during any activity, and could only stand for ten minutes, sit for ten minutes without elevating his left leg, sit for forty-five minutes to an hour if he elevates his left leg, and lift twenty pounds. While Bolek's impairments could reasonably produce these symptoms, the ALJ found that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  *Id.* at 15.

While the ALJ noted "[e]lectrodiagnostic studies indicated that the claimant has a peroneal neuropathy at or about the fibular head with evidence of demyelination but no acute denervation" and "MRI findings of the knee suggested an edema anteriorly in the patellar tendon and patella, and tibial tuberosity," the ALJ relied on other physical examinations that noted Bolek had a "stable knee."  *Id.* at 15-16.  Other records showed Bolek's knee was "ligamentously intact with mild or no significant effusion" and Bolek

"could achieve at least 75 percent flexion before having excessive pain." *Id.* at 16. He also exhibited fair knee strength, brisk deep tendon reflexes that were symmetric, and no tenderness, erythema, increased warmth, or ecchymosis in the left knee. *Id.* The ALJ also relied on physical examinations that showed "functionally intact range of motion in all extremities" as well as no joint swelling, normal bulk and tone, and normal upper extremity and back flexibility. *Id.* For these reasons, the ALJ did not give full credibility to Bolek's testimony regarding his alleged disabling pain. *Id.* at 15.

The ALJ considered Bolek's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, in determining Bolek could make a successful adjustment to sedentary lines of work. *Id.* at 17-18. Relying on the vocational expert's testimony, the ALJ concluded that Bolek could perform his past relevant work as a personal banker as well as jobs in the national economy including telephone quotation clerk, charge account clerk, and order clerk. *Id.* at 18. Bolek was found not disabled, and the ALJ denied Bolek's disability insurance benefits application as well as his application for supplemental security income. *Id.* at 19.

## II.   DISCUSSION

### A.   Standard of Review

When reviewing a Social Security disability benefits decision, the district court does not act as a factfinder or substitute its judgment for the judgment of the ALJ or the Commissioner. *See Bates v. Chater,* 54 F.3d 529, 532 (8th Cir. 1995) (citing *Loving v. Dep't of Health & Hum. Serv., Sec.,* 16 F.3d 967, 969 (8th Cir. 1994)). Rather, the district court's review is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal

standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). Substantial evidence "is 'more than a mere scintilla.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S.Ct. at 1154 (quoting *Consolidated Edison*, 305 U.S. at 229).

However, this "review is more than a search of the record for evidence supporting the [ALJ or Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (quoting *Hunt v. Massanari*, 250 F.3d 622, 623 (8th Cir. 2001); *Cooper v. Sullivan*, 919 F.2d 1317, 1320 (8th Cir. 1990)). In determining whether there is substantial evidence to support the Commissioner's decision, this Court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

### B.   Law and Analysis

#### 1.   Inferior Officers and the Appointments Clause

A claimant's failure to raise an Appointments Clause challenge before the ALJ forfeits the issue upon judicial review. *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878-79 (1991) (holding that Appointments Clause challenges are non-jurisdictional and can be forfeited if they are not timely asserted); *see also NLRB v. RELCO Locomotives, Inc.,* 734 F.3d 764, 798 (8th Cir. 2013) (holding the party waived an Appointments Clause challenge by failing to raise the issue before the agency). Indeed, only a party "'who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case' is entitled to relief." *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055 (2018) (quoting *Ryder v. United States*, 515 U.S. 177, 182-83

(1995)).  The Court finds it need not address Bolek's Appointments Clause claim because it was not presented in administrative proceedings.

### 2.    Sequential Analysis

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits.  *See* 20 C.F.R. § 404.1520(a)(4).   The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's RFC and his or her age, education, and work experience.  *Id.*  At step one, the claimant has the burden to establish that he or she has not engaged in substantial gainful activity since his or her alleged disability onset date.  *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998). At step two, the claimant has the burden to prove he or she has a medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities.  *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013).

At step three of the sequential evaluation, "If the claimant suffers from an impairment that is listed in," Appendix to 20 C.F.R. Pt. 404, Subpart P ("the listings") "or is equal to such a listed impairment, the claimant will be determined disabled without consideration of age, education, or work experience."  *Flanery v. Chater*, 112 F.3d 346, 349 (8th Cir. 1997); *see also* 20 C.F.R. § 404.1525.   The listings stipulate the criteria for each impairment that is considered presumptively disabling.  20 C.F.R. Pt. 404, Subpart P, App. 1.  If the claimant does not meet the listing requirements, the ALJ determines the claimant's RFC, which the ALJ uses at steps four and five.  20 C.F.R. § 404.1520(a)(4).

A claimant's RFC is what he or she can do despite the limitations caused by any mental or physical impairments.  *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20

14

C.F.R. § 404.1545(a).   The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations.   *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015).   The RFC must (1) give appropriate consideration to all of [the claimant's] impairments, and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting."   *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016) (quoting *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011)).

At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work.   *Cuthrell*, 702 F.3d at 1116.   If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform.   *See Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (citing *Reed v. Sullivan*, 988 F.2d 812, 815-16 (8th Cir. 1993)).

Bolek argues that the ALJ erred in step three of the sequential analysis by finding that Bolek was not presumptively disabled as he did not meet the requirements set forth in 20 C.F.R. Pt. 404, Subpart P, App. 1.   Bolek claims that he should be found presumptively disabled by reason of major dysfunction of a joint.   20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.02A.   This listing requires:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).   With:

A.     Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b. 20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.02.

Bolek argues that, as he cannot ambulate effectively, the ALJ should have found him presumptively disabled.   The inability to ambulate effectively is defined as "an extreme limitation of the ability to walk . . . . having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."   20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.00B2b(1).  Also, "[t]o ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." 20 C.F.R. Pt. 404, Subpart P, App. 1 § 1.00B2b(2).  Some examples of an individual who cannot ambulate effectively are those who must use a walker, two crutches or canes, and those who are unable to complete daily activities such as shopping, using public transportation, or climbing a flight of stairs with the use of a handrail.  *Id.*

The Court need not determine if Bolek can ambulate effectively as, even if he cannot, he has failed to establish the remaining requirements of Listing 1.02A.  Listing 1.02A requires evidence of a "major joint dysfunction characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)."   20 C.F.R. Pt. 404, Subpart P, App. 1 §1.02A.  The claimant must meet all of these criteria as well as the inability to ambulate effectively in order to be found presumptively disabled.  *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990)).  The burden of proof rests "on the plaintiff to establish that his or her

16

impairment meets or equals a listing." *Johnson*, 390 F.3d at 1070 (citing *Sullivan*, 493 U.S. at 530).

Even if a claimant is not presumptively disabled under the listing requirements, the claimant may be found disabled under step three if the combined effect of other medical impairments is medically equivalent to the listing in question. 20 C.F.R. § 404.1526(b)(3). Bolek argues that the ALJ erred in not finding Bolek's impairments to be medically equivalent to the listing. A person's impairment is medically equivalent to a listing when

"it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).[3]

The ALJ found that Bolek's impairments were not medically equivalent to either listing 1.02 (major dysfunction of a joint) or listing 11.14 (peripheral neuropathy). Filing No. 9-2, Tr. at 14; 20 C.F.R. Pt. 404, Subpart P, App. 1 §1.02A; 20 C.F.R. Pt. 404, Subpart P, App. 1 § 11.14. The ALJ determined the impairments were not medically equivalent as Bolek did not produce evidence that medically equaled the severity required by either

---

[3] There are three ways to determine medical equivalence:
    (1)(i) If you have an impairment that is described in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter, but –
        (A) You do not exhibit one or more of the findings specified in the particular listing, or
        (B) You exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing.
    (i) We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.
    (2) If you have an impairment(s) that is not described in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter, we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing.
    (3) If you have a combination of impairments, no one of which meets a listing described in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter (see § 416.925(c)(3)), we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.
20 C.F.R. § 416.926(b)(1)-(3).

listing.  Filing No. 9-2, Tr. at 14.  While Bolek may arguably meet the criteria, the ALJ's determination is supported by substantial evidence.  *See Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003) (citing *Hunt*, 250 F.3d at 623).  Whether the ALJ erred in his determination does not matter as the Court finds Bolek disabled at step four of the sequential analysis.

### 3.    Treating Physician

"The ALJ must give 'controlling weight' to a treating physician's opinion if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh*, 786 F.3d at 1132 (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007).  Even if not entitled to controlling weight, a treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight.  *Papesh*, 786 F.3d at 1132.  The regulatory framework requires the ALJ to evaluate a testing source's opinion in consideration of factors such as length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating source.  *See* 20 C.F.R. 404.1527(c)(2).  "When an ALJ discounts a treating physician's opinion, he should give 'good reasons' for doing so."  *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (quoting *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002)).

The ALJ failed to properly credit the opinions of Dr. Gallant.  Though the conclusion that Bolek is unable to work may be a decision initially reserved to the Commissioner, the assessment of Bolek's medical limitations and conditions is not.  While Dr. Gallant did initially limit Bolek to sedentary work, Dr. Gallant expressed that Bolek was unable to work on May 23, 2017, approximately one month after Bolek began using a wheelchair for

ambulation.  *Compare* Filing No. 9-9, Tr. at 470 (stating, "Overall his work performance put him in the sedentary physical dem and level" during a physical exam in November 2016) *with* id. at 504-505 (recording the purchase of a wheelchair with an elevating leg rest) *and* Filing No. 9-2, Tr. at 40 (testifying that he uses a wheelchair or crutches to ambulate) *and with* Filing No. 9-9, at 533-34 (noting on May 23, 2017 that Bolek cannot perform any work).  Bolek's persistent, extreme, unimproved knee pain combined with the new use of a wheelchair is consistent with Dr. Gallant's changed opinion that Bolek could no longer perform even sedentary work.  The ALJ erred in not giving Dr. Gallant's opinion substantial weight.

### 4.   Credibility

In determining whether to fully credit a claimant's subjective complaints of disabling pain, the Commissioner engages in a two-step process: (1) first, the ALJ considers if there is an underlying impairment that could reasonably produce the claimant's symptoms; and (2) if so, the ALJ evaluates the claimant's description of "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit" the claimant's ability to work.  Soc. Sec. Rul. 16-3p; Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 FR 14166-01 (Mar. 16, 2016).  In the second step of the analysis, in recognition of the fact that "some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence[,]" an ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and

other persons; and any other relevant evidence in the individual's case record." 81 Fed. Reg. at 14168.

To determine the intensity, persistence, and intensity of an individual's symptoms, the ALJ evaluates objective medical evidence, but "will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." Id. However, the ALJ must "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." Id. at 14169. If an ALJ cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then he must carefully consider other evidence in the record – including "statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors[4] set forth in [the Social Security] regulations" – in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. Id.

Social Security Ruling 16-3p also provides:

---

[4] Those factors include:

"1) Daily activities; 2) The location, duration, frequency, and intensity of pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms."

Id. at 14169-70.

> We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult or the ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim. Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.

*Id.* at 14170. "[The Eighth Circuit Court of Appeals] has repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity to engage in substantial gainful activity." *Wagner*, 499 F.3d at 851 (quoting *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000)). "'Allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications,'" similarly, "'a failure to follow a recommended course of treatment also weighs against a claimant's credibility.'" *Wagner*, 499 F.3d at 851 (quoting *Singh*, 222 F.3d at 453; *Guillams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005)).

The ALJ properly determined that Bolek's mental impairments of depression, anxiety, and memory issues are non-severe. The medical record does not support Bolek's claims that he has difficult remembering things. While the record does support Bolek's diagnoses of depression and anxiety, he reported great improvement with medication. *See* Filing No. 9-9, Tr. at 499 (telling a psychiatrist the anti-depressant medication saved his life), *see also id.* at 468 (noting Bolek's suicidal ideations from three months prior had improved with Cymbalta). However, the ALJ failed to consider Bolek's mental health diagnoses in the overall assessment of Bolek's impairments. The medical testimony regarding pain as well as mental health issues, coupled with his anti-

depressant medications, should have been considered in the overall determination of his ability to work as defined under the statute and guidelines.

The ALJ improperly evaluated Bolek's complaints of disabling pain. The ALJ claimed that Bolek's knee injury had "improve[d] with treatment." Filing No. 9-2, Tr. at 18. However, the medical record does not support this assertion. Dr. Gallant noted numerous times that Bolek's condition had failed to improve. Filing No. 9-8, Tr. at 418, 456; Filing No. 9-9, Tr. at 468, 470, 472, 477, 483.

The ALJ relied on Dr. Pitner's opinions from February and March of 2015 to determine "other physical examinations indicated that the claimant had a stable knee." See Filing No. 9-2, Tr. at 16 (citing to Dr. Pitner's two examinations in February and March of 2015). While Dr. Pitner's examinations do state plaintiff's knee is stable, he also notes that Bolek was "very difficult to examine" and had "definite exquisite pain anteriorly with palpation or patellar compression." Filing No. 9-7, Tr. at 306. Dr. Pitner did state there was no surgical option that would benefit him but did note "anterior knee pain trauma can cause significant ongoing pain." Id. Dr. Pitner's assessment supports Bolek's subjective description of his pain.

Bolek has consistently complied with Dr. Gallant's orders, has consistently sought medical treatment since his onset date of January 20, 2015, and has consistently increased his dosages and tried a variety of procedures and exercises to alleviate his pain. Both Dr. Pitman's and Dr. Gallant's progress notes state Bolek has experienced extreme pain that has not improved with medication, procedures, or physical therapy. Objective medical evidence supports the level and intensity of Bolek's pain, and the ALJ erred in not fully crediting Bolek's testimony.

The ALJ further erred in making his RFC determination and failed to properly consider the opinion of the treating physician and did not properly consider Bolek's complaints of pain. Medical source evidence supports the conclusion that Bolek is not capable of sedentary work. After Bolek testified that he can only sit for a maximum of four hours before needing to lay down, the ALJ posed a hypothetical to the vocational expert that asked if there were any jobs in the national economy that would permit Bolek's limitations. Filing No. 9-2, Tr. at 71-72. The vocational expert testified that none of Bolek's past jobs and no jobs in the national economy would allow for his limitations. *Id.* at 72. However, after discrediting Bolek's testimony and the opinion of Dr. Gallant, the ALJ instead cited the vocational expert's answer to a different hypothetical that did not consider Bolek's limitations. *Id.* at 18-19. The ALJ erred in relying on the vocational expert's opinion of a hypothetical that did not address Bolek's severe impairment and complaints of extreme pain.

## III.   CONCLUSION

The clear weight of the evidence points to a conclusion that Bolek has been disabled since his claimed onset date of January 20, 2015. "Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate." *Hutsell v. Massanari*, 259 F.3d 707, 714 (8th Cir. 2001) (quoting *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984). Accordingly,

IT IS ORDERED:

1. Plaintiff's motion to reverse (Filing No. 11) is granted;

2. Defendant's motion to affirm (Filing No. 13) is denied;

3. The decision of the Commissioner is reversed; and

4.  This action is remanded to the Social Security Administration for an award of

benefits.

5.  A judgment will be entered in accordance with this memorandum and order.


Dated this 19th day of June, 2020.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge